# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMOS CHAN CHAN JR.,<br><br>  Plaintiff,<br><br>  v.<br><br>CHILDREN'S NATIONAL MEDICAL CENTER,<br><br>  Defendant. | Civil Action No. 18-2102 (CKK) |

## MEMORANDUM OPINION
(January 8, 2021)

Plaintiff Amos Chan Chan brings this action against his former employer Defendant Children's National Medical Center ("CNMC"). Mr. Chan Chan retains two surviving claims in this case: (1) a retaliation claim under the District of Columbia Human Rights Act ("DCHRA") in Count III of his Amended Complaint; and (2) a retaliatory hostile work environment claim under the DCHRA in Count IV of the Amended Complaint. *See* Am. Compl., at ¶¶ 37–42. The Court previously dismissed, in its September 18, 2019 order, Mr. Chan Chan's wage and hour claims in Counts I and II of the Amended Complaint. *See* Sept. 18, 2019 Order, ECF No. 27.

CNMC has now filed its Motion for Summary Judgment, seeking the dismissal of Mr. Chan Chan's remaining claims for retaliation in Counts III and IV of the Amended Complaint. Upon consideration of the briefing, the relevant authorities, and the record as a whole,[1] the Court

---

[1] The Court's consideration has focused on the following briefing and material submitted by the parties:
- Am. Compl., ECF No. 22;
- Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 40-1;
- Def.'s Stmt. of Undisputed Facts ("Def.'s Stmt. of Facts"), ECF No. 40-1 at Part III;
- Pl.'s Resp. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 41; and,
- Pl.'s Stmt. of Disputed Material Facts ("Pl.'s Stmt. of Facts"), ECF No. 41 at 1–4;
- Pl.'s Stmt. of Additional Material Facts ("Pl.'s Stmt. of Add'l Facts"), ECF No. 41 at 4–16; and
- Def.'s Reply, ECF No. 43.

**GRANTS** CNMC's Motion for Summary Judgment and **DISMISSES** Mr. Chan Chan's remaining claims in Counts III and IV of the Amended Complaint.

## I. BACKGROUND

### A. Mr. Chan Chan's Employment at CNMC

Mr. Chan Chan began his employment with CNMC on November 30, 2009, at CNMC's Sheikh Zayad Hospital Campus, located at 111 Michigan Avenue NW, Washington, D.C. 20010. *See* Def.'s Stmt. of Facts, at ¶ 1.  CNMC initially hired Mr. Chan Chan to work "as a non-exempt, full-time Cook in the Food and Nutrition Department at Children's Hospital."  *Id.* at ¶ 2. Throughout his CNMC employment, Mr. Chan Chan was a member of the Service Employees International Union, Local 722, AFL-CIO.  *See id.* at ¶¶ 3–4.  Additionally, Mr. Chan Chan duly "received a copy of CNMC's employee handbook, which includes an overview of CNMC's personnel policies."  *Id.* at ¶ 5.  Mr. Chan Chan also had "access to CNMC's personnel policies via CNMC's employee intranet."  *Id.* at ¶ 6.

In July 2014, Mr. Chan Chan transferred to a position as a "Floor Tech[nician]" within the Environmental Services ("EVS") Department at CNMC.  *Id.* at ¶¶ 7–12; *see also* Pl.'s Stmt. of Add'l Facts, at ¶ 2.  Floor technicians within the EVS Department are responsible for cleaning carpets, disinfecting hard surface floors, and disposing of floor care chemicals.  *See* Pl.'s Stmt. of Add'l Facts, at ¶ 2(a)–(f).  Floor technicians are also expected to "perform[] routine cleaning as needed," including removing "trash and soiled linens."  Def.'s Mot., Ex. I (Job Description), at 3. As a floor technician, CNMC also required that Mr. Chan Chan arrive to work on time and at the appropriate location for his shift.  *See id.* at 4; Def.'s Stmt. of Fact, at ¶ 18.  Mr. Chan Chan "worked the 11:00 p.m. to 7:30 a.m. shift . . . throughout his employment" at CNMC as a floor

technician, Def.'s Stmt. of Fact, at ¶ 12, with the possibility of occasional overtime shifts, where approved, *see* Pl.'s Stmt. of Add'l Facts, at ¶¶ 8–9.

Over the course of his tenure as a floor technician, Mr. Chan Chan had multiple CNMC supervisors within the EVS Department. Mr. Chan Chan's direct EVS supervisor was Ms. Mavis Appleby. *See* Def.'s Stmt. of Facts, at ¶ 13. As a CNMC supervisor, Ms. Appleby had the authority to "conduct performance evaluations" and "write-up employees" for disciplinary reasons, but she could not "promote, demote, or fire employees." Pl.'s Stmt. of Add'l Facts, at ¶ 4. While Mr. Chan Chan was working at the EVS Department, Ms. Appleby reported to a supervisor named Ms. Janae Camp. *See id.* Ms. Appleby also reported to another supervisor in the EVS Department named Ms. Lawanda Pope, who additionally served as Mr. Chan Chan's second-level supervisor. *See* Def.'s Stmt. of Fact, at ¶ 14. Ms. Pope worked as an office manager for the EVS Department. *See* Pl.'s Stmt. of Add'l Facts, at ¶ 5. In that role, Ms. Pope was responsible for reviewing time records submitted by EVS Department employees, including Mr. Chan Chan. *See* Def.'s Mot., Ex. H (Pope Decl.), at ¶ 12. Finally, Ms. Pope reported to Mr. Nikolas Mantasas, the EVS Department Director. Pl.'s Stmt. of Add'l Facts, at ¶ 6.

## B. Mr. Chan Chan's Discrimination Complaints

During his time in the EVS Department from 2014 through 2017, Mr. Chan Chan lodged numerous complaints against his EVS Department supervisors. First, Mr. Chan Chan verbally complained to Ms. Janae Camp in August 2014 that Ms. Appleby was treating him in a discriminatory manner and assigning him tasks that he was incapable of finishing on time. *See id.* at ¶¶ 12–13. For example, Ms. Appleby required Mr. Chan Chan to perform "housekeeping work and clean restrooms," as well as collect blood bags for disposal. *Id.* at ¶ 37. A few months later, in September 2014, Mr. Chan Chan again complained verbally to Ms. Camp about Ms. Appleby,

this time specifying that Ms. Appleby treated Mr. Chan Chan differently "because he was from Africa." *Id.* at ¶ 14. Ms. Appleby, however, later learned of Mr. Chan Chan's verbal discrimination complaints to Ms. Camp, *see id.* at ¶ 16, and subsequently assigned Mr. Chan Chan "more jobs than other employees," *id.* at ¶ 18.

In 2015, Mr. Chan Chan raised additional employment complaints, most of which materialized through emails. In August 2015, Mr. Chan Chan emailed Ms. Camp a complaint regarding "race/color, discrimination, and harassment," stating that "there should be no harassment on the job because of the color of a person." Pl.'s Opp'n, Ex. 3 (Aug. 25, 2015 Email), at 1. Then, on September 17, 2015, Mr. Chan Chan sent another email to Ms. Camp, again complaining of Ms. Appleby's behavior and alleging discrimination on the basis of "who [he was]." Pl.'s Stmt. of Add'l Facts, at ¶ 23. Mr. Chan Chan also sent three emails to Mr. Mantasas, the EVS Department Director, further complaining of Ms. Appleby's supervisory conduct. *See id.* at ¶ 25. And on September 30, 2015, Mr. Chan Chan emailed Ms. Denise Cooper, the HR Program Director of Labor & Compliance at CNMC, complaining of harassment from his supervisors. *See id.* at ¶ 26.

Mr. Chan Chan also filed two formal administrative complaints in 2015. First, Mr. Chan Chan filed a complaint against CNMC on September 11, 2015 with the U.S Department of Labor's Occupational Safety and Health Administration ("OSHA"). *See* Pl.'s Stmt. of Add'l Facts, at ¶ 31. In this OSHA complaint, Mr. Chan Chan lamented the fact that he needed to use a "floor finishing chemical" on the job, and that CNMC failed to provide the appropriate "personal protecti[ve] equipment" needed for this type of work. *Id.* Shortly thereafter, Mr. Chan Chan also submitted an Intake Questionnaire form to the Equal Employment Opportunity Commission ("EEOC") on September 30, 2015. *See id.* at ¶ 29; Pl.'s Opp'n, Ex. 8 (EEOC Intake Form), at 1.

In this EEOC intake document, Mr. Chan Chan again complained that his CNMC supervisors had called him "African," specifically referencing Ms. Appleby and another CNMC supervisor named Mr. Rodney Hunter.  Pl.'s Opp'n, Ex. 8 (EEOC Intake Form), at 2.  On November 13, 2015, however, the EEOC issued Mr. Chan Chan a Dismissal and Notice of Right to Sue Letter, indicating that the agency could not conclude that Mr. Chan Chan's allegations established a violation of law.  *See* Def.'s Stmt. of Facts, at ¶ 66; Def.'s Mot, Ex. A (Chan Chan Dep.), at 182:17–22.

Finally, Mr. Chan Chan's pattern of employment complaints continued into the 2017 work year.  On April 24, 2017, Mr. Chan Chan sent another email to the EVS Department Director, Mr. Mantasas, complaining about "supervisor treatment" at CNMC.  Pl.'s Stmt. of Add'l Facts, at ¶ 35; *see also* Pl.'s Opp'n, Ex. 11 (Apr. 24, 2017 Email), at 1.  Therein, Mr. Chan Chan again cited to "several years" of disrespectful treatment from Ms. Appleby, noting that Ms. Appleby acted as a "mother" to her supervisees.  *See id.*  In his April 24, 2017 email, however, Mr. Chan Chan made no mention of his African heritage or any specific reference to race-based discrimination by any CNMC supervisor.  *See id.*  Mr. Chan Chan also testified that, in August 2017, a CNMC supervisor named "Mr. Karenja" denied Mr. Chan Chan an overtime assignment, which Mr. Chan Chan had requested.  *See* Def.'s Mot., Ex. A (Chan Chan Dep.), at 263.

## C.  Mr. Chan Chan's Attendance Violations

While Mr. Chan Chan was raising complaints about his CNMC supervisors, he was also incurring a number of attendance violations on the job.  As a matter of policy, all CNMC "[e]mployees are expected to be on time, appropriately dressed and ready for work at the assigned location, as scheduled."  Def.'s Stmt. of Facts, at ¶ 18.  To document employee attendance and punctuality, CNMC requires employees to "scan in" and "scan out" with their identification cards

on time clocks at the beginning and end of their shifts. *See id.* at ¶¶ 20–23. CNMC issues "corrective actions" to employees who fail to scan in for their shifts, or otherwise exhibit attendance problems such as tardiness or absenteeism. *See id.* at ¶¶ 28–30.

Between May 15, 2015 and April 11, 2016, Mr. Chan Chan received thirteen "corrective actions." *See* Pl.'s Stmt. of Add'l Facts, at ¶ 43(a)–(m). Mr. Chan Chan received these corrective actions for a variety of disciplinary reasons, including missed scans, absenteeism, tardiness, and insubordination. *See id.* Moreover, Mr. Chan Chan received these corrective actions from four different EVS Department supervisors: Ms. Appleby, Mr. Rodney Hunter, Ms. Melissa Sutton, and Ms. Pope. *See id.* Notably, these corrective actions also included five separate suspensions: (1) on May 26, 2015, Mr. Hunter suspended Mr. Chan Chan for multiple missed scans, (2) on August 24, 2015, Ms. Sutton suspended Mr. Chan Chan for tardiness, (3) on October 21, 2015, Ms. Appleby suspended Mr. Chan Chan for insubordination, (4) on January 7, 2016, Ms. Appleby suspended Mr. Chan Chan for absenteeism and tardiness, and (5) on April 11, 2016, Ms. Pope suspended Mr. Chan Chan for seven missed card swipes. *See id.*

In 2017, Mr. Chan Chan continued to incur disciplinary sanctions for attendance violations. On August 31, 2017, Ms. Pope sent Mr. Chan Chan an email citing three separate attendance violations that month: "On 8/10/2017, 8/18/2017 and 8/30/2017 you left messages on the department's call-out line to report you would be late. However, you did not report for the shift and failed to call back to report the absence of the entire shift." Def.'s Mot., Ex. H at Ex. 11 (Aug. 31, 2017 Email), at 1. Shortly thereafter, however, Mr. Chan Chan incurred yet another attendance violation on October 5, 2017 for "absenteeism/tardiness." Def.'s Stmt. of Facts, at ¶ 43. As a result of this latest attendance violation, Mr. Chan Chan received yet another suspension from Ms. Pope on October 18, 2017. *See id.*; Pl.'s Stmt. of Add'l Facts, at ¶ 43(n).

Additionally, Mr. Chan Chan encountered specific problems with his use of CNMC's "Employee Time Record Exceptions Form" (the "Employee Time Exception" form). *See* Def.'s Stmt. of Facts, at ¶ 27. CNMC employees could utilize an Employee Time Exception form to "retroactively document their working hours in the event of a missed 'scan' during their shift." *Id.* But importantly, CNMC employees were required to record their time accurately when using an Employee Time Exception form. *See id.* at ¶ 19. To ensure such accuracy, Ms. Pope would review Employee Time Exception forms submitted by employees, like Mr. Chan Chan, in the EVS Department. *See* Def.'s Mot., Ex. H (Pope Decl.), at ¶ 12. In her review, Ms. Pope would cross-reference the employee's Employee Time Exception form against the relevant security footage and the employee's "All Access" report from the date in question. *See id.* at ¶ 13. CNMC's "All Access" reports show "the date and time for all scans on the hospital's campus by the ID badge issued to each of its employees." Def.'s Stmt. of Facts, at 25; *see also* Pl.'s Stmt. of Add'l Facts, at ¶ 45. Consequently, Ms. Pope could compare the time an employee recorded on his Employee Time Exception form for a particular shift with the specific time that the employee entered and exited the hospital grounds. *See id.*

In May 2016, Mr. Chan Chan submitted two Employee Time Exception forms after failing to scan in for his shifts on May 4, 2016 and May 5, 2016. *See* Def.'s Mot., Ex. H (Pope Decl.), at ¶¶ 14–15. Upon review of these forms, however, Ms. Pope discovered discrepancies between Mr. Chan Chan's time entries and the security footage and All Access reports, which showed that Mr. Chan Chan had left his shift early on May 4th and arrived for his shift late on May 5th. *See id.* Following these two incidents, Ms. Pope recommended that Mr. Chan Chan should be terminated, but Mr. Mantasas decided not to approve Mr. Chan Chan's dismissal at that time. *See id.* at ¶ 16; Pl.'s Stmt. of Add'l Facts, at ¶ 50.

7

Then in 2017, Mr. Chan Chan submitted another two Employee Time Exception forms for his shifts on August 15, 2017 and August 16, 2017. *See* Def.'s Mot., Ex. H at Ex. 13 (Aug. 31, 2017 Email), at 1. On August 31, 2017, however, Ms. Pope notified Mr. Chan Chan of inaccuracies she had identified in these forms. *See id.* Ms. Pope then expressly reminded Mr. Chan Chan "that any falsification of information on the Employee Time Exception form may lead to disciplinary action including termination." *Id.* Similarly, the Employee Time Exception form itself requires a signature from the CNMC employee using the form, acknowledging that "any falsification" on the form "may lead to disciplinary action including termination." *Id.* at 5.

**D.  Mr. Chan Chan's October 24, 2017 Termination**

On October 10, 2017, Mr. Chan Chan submitted yet another Employee Time Exception form to Ms. Pope. *See* Def.'s Stmt. of Facts, at ¶ 47. This particular form pertained to Mr. Chan Chan's September 25, 2017 shift, which was scheduled to begin at 11:00 p.m on September 25, 2017 and conclude at 7:30 a.m. on September 26, 2017. *See id.* On his Employee Time Exception form, Mr. Chan Chan indicated that he failed to scan in for the shift, but arrived on time at 11:00 p.m. and departed, as scheduled, at 7:30 a.m. *See* Def.'s Mot., Ex. H at Ex. 14 (Sept. 25, 2017 Employee Time Exception Form), at 3. Mr. Chan Chan also signed a "sign-in sheet" for his September 25, 2017 shift, but that document did not commemorate the specific time at which Mr. Chan Chan arrived for his shift that evening. *See* Pl.'s Opp'n, Ex. 27 (Sept. 25, 2017 Sign-In Sheet), at 1.

As was her practice, Ms. Pope subsequently reviewed Mr. Chan Chan's most recent Employee Time Exception form for accuracy. *See* Def.'s Mot., Ex. H (Pope Decl.), at ¶¶ 13, 20. Specifically, Ms. Pope compared the September 25th and 26th time entries on Mr. Chan Chan's Employee Time Exception form to the All Access report for that same time period. *See id.* It is

undisputed in the record that the All Access report showed Mr. Chan Chan "entering the employee garage at 11:18 p.m., and leaving the garage at 7:21 a.m."  Def.'s Stmt. of Facts, at ¶ 48; *see also* Pl.'s Stmt. of Facts, at ¶ 48.  CNMC subsequently terminated Mr. Chan Chan on October 24, 2017 for "falsifying" the entry on his September 25, 2017 Employee Time Exception form, which was inconsistent with the time entries reflected on the All Access report.  *See* Def.'s Mot., Ex. H at Ex. 15 (Oct. 24, 2017 Termination Letter), at 1.

Following his termination, Mr. Chan Chan participated in a union grievance hearing on November 30, 2017, led by Ms. Denise Cooper, the HR Program Director of Labor & Compliance at CNMC.  *See* Def.'s Stmt. of Facts, at ¶¶ 51–52. At the hearing, Ms. Cooper afforded Mr. Chan Chan an opportunity "to explain why his Employee Time Exception form for September 25, 2017 indicated that he arrived to his work area at 11:00 p.m., and left his work area at 7:30 a.m., although the All Access . . . report showed him scanning into the employee parking garage at 11:18 p.m. and scanning out of the garage at 7:21 a.m."  *Id.* at ¶ 53.  In response, Mr. Chan Chan stated that:

> "his wife dropped him off at the ED [(Emergency Department)] entrance before driving to her job at Catholic University. However, before arriving at Catholic University she called Mr. Chan Chan and said she was coming to leave the car with him. Mr. Chan Chan said he exited the hospital through the ED doors to meet his wife and retrieve the car and his wife took an Uber to Catholic University. Mr. Chan Chan said he then drove his car to the loading dock area where he parked the car. He further stated while still in the EVS Department area he heard an overhead announcement stating anyone parking the loading dock area should remove their car. Mr. Chan Chan said in response to the overhead announcement he exited the building through the loading dock doors and drove to and entered the employee parking garage and then re-entered the Hospital using the elevator in the main lobby."

*Id.* at ¶ 54; *see also* Pl.'s Stmt. of Facts, at 54.

But upon investigation, Ms. Cooper found that Mr. Chan Chan's proffered explanation lacked credibility.  First, Ms. Cooper obtained the All Access report "for the loading dock between 10:30 p.m. and 12:00 a.m. on September 25, 2017," and "confirmed that Mr. Chan Chan had not

exited or entered the loading dock on the date and time in question."  Def.'s Stmt. of Facts, at ¶¶ 56–57.  Moreover, Ms. Cooper discovered that CNMC's "log of overhead announcements for the night of September 25, 2017 did not include an announcement that a vehicle was parked in the loading dock area and should be moved, as alleged by Mr. Chan Chan at the grievance hearing." *Id.* at ¶ 59.  Lastly, the CNMC video footage from September 25, 2017 shows Mr. Chan Chan entering the hospital at 11:22 p.m., but not any earlier.  *See id.* at ¶ 61.  For these reasons, "Ms. Cooper issued a Step 1 Grievance Decision finding that the termination of Mr. Chan Chan's employment for falsification of timecard records was appropriate."  *Id.* at ¶ 63 (cleaned up and quotation omitted); *see also* Pl.'s Stmt. of Facts, at ¶ 63.

**E.  Procedural Background**

Following his October 24, 2017 termination and the subsequent grievance hearing, Mr. Chan Chan filed a civil action against CNMC on May 15, 2018.  *See* Not. of Removal, ECF No. 1, at ¶ 1.  Mr. Chan Chan later amended his complaint before this Court on October 18, 2018, asserting four claims against CNMC for: (1) unpaid wages under District of Columbia Code sections 32-1301 through 32-1303; (2) unpaid wages under the Fair Labor Standards Act ("FLSA"); (3) retaliation under the DCHRA; and (4) a retaliatory hostile work environment under the DCHRA.  *See* Am. Compl., at ¶¶ 31–42.

On November 1, 2018, however, CNMC moved under Federal Rule of Civil Procedure 12(b)(6) for a partial dismissal of Mr. Chan Chan's Amended Complaint.  *See* Def.'s Mot. to Dismiss, ECF No. 23, at 1.  The Court granted CNMC's motion in part, dismissing Mr. Chan Chan's claims in Counts I and II of the Amended Complaint for unpaid wages under District of Columbia and federal law.  *See Chan Chan v. Children's Nat'l Med. Ctr.*, No. CV 18-2102 (CKK), 2019 WL 4471789, at *3–6 (D.D.C. Sept. 18, 2019).  Specifically, the Court held that Mr. Chan

Chan's claim in Count I did not adequately allege an "unpaid wage" sufficient to state a cognizable claim under the D.C. Wage Payment Act.  *See id.* at *4.  Similarly, the Court dismissed Mr. Chan Chan's claim in Count II because his Amended Complaint did "not sufficiently allege a minimum wage or overtime claim under the FLSA."  *Id.* at *6.  With regards to Mr. Chan Chan's DCHRA claim for retaliation in Count III of the Amended Complaint, the Court found that "any retaliation claim premised on actions [pre]-dating October 18, 2017" was untimely under the DCHRA.  *Id.* at *7.  The Court, however, did not dismiss Mr. Chan Chan's retaliation claim in Count III, so far as it relied upon actions "after October 18, 2017, including his termination on October 24, 2017."  *Id.* at *10.  Neither did the Court dismiss Mr. Chan Chan's retaliatory hostile work environment claim in Count IV of the Amended Complaint.  *See id.*

Thereafter, the parties engaged in discovery regarding Mr. Chan Chan's two surviving DCHRA claims.  At the conclusion of discovery, CNMC moved for summary judgment against Mr. Chan Chan on his remaining claims in Counts III and IV of the Amended Complaint.  *See* May 26, 2020 Minute Order.  The parties have now completed their briefing on CNMC's Motion for Summary Judgment, and that motion is presently ripe for the Court's review.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; instead, the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the

dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with "all justifiable inferences drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

### III. DISCUSSION

Mr. Chan Chan retains two surviving claims against CNMC in this action: Count III of his Amended Complaint asserts a retaliation claim under the DCHRA, and Count IV of the Amended Complaint asserts a claim for retaliatory hostile work environment, also under the DCHRA. *See* Am. Compl., at ¶¶ 37–42. For the reasons set forth herein, the Court will **GRANT** summary judgment in favor of CNMC and **DISMISS** both Counts III and IV of the Amended Complaint.

### A. Count III – Retaliation

In Count III of his Amended Complaint, Mr. Chan Chan asserts a claim for retaliation under the DCHRA. *See* Am. Compl., at ¶¶ 37–39. To establish a prime facie case of retaliation, a plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *see also Singh v. Am. Ass'n of Retired Persons, Inc.*, 456 F. Supp. 3d 1, 6 (D.D.C. 2020).

If the plaintiff states such a prima facie claim, then "the burden shifts to the employer to produce a legitimate, [non-retaliatory] reason for its actions." *Jones*, 557 F.3d at 677 (quotation omitted); *see also Vogel v. D.C. Office of Planning*, 944 A.2d 456, 463 (D.C. 2008). "Once the employer proffers a non-retaliatory reason for the challenged employment action," then "the burden-shifting framework falls away, and the 'central question' becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee.'" *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (quoting *Brady v. Office of*

*Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).   When "[e]valuating an employer's asserted reason for a discharge, [the Court] ask[s] not whether the employer was objectively correct in discharging the employee but instead whether 'the employer honestly believes in the reasons it offers.'"   *Ball v. George Washington Univ.*, 798 F. App'x 654, 655 (D.C. Cir. 2020) (quoting *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

In this case, Mr. Chan Chan bases his retaliation claim on his October 24, 2017 termination from CNMC.   *See* Pl.'s Stmt. of Add'l Facts, at ¶¶ 52–64.[2]   Specifically, Mr. Chan Chan argues that his CNMC supervisors in the Environmental Services Department, Ms. Lawanda Pope and Mr. Nikolas Mantasas, terminated him in retaliation for his prior discrimination complaints.   *See* Pl.'s Opp'n at 17–23.   These prior complaints included, for example, informal email complaints regarding Mr. Chan Chan's "race" in 2015, *see* Pl.'s Stmt. of Add'l Facts, at ¶¶ 20–30, an EEOC intake form submitted in 2015 addressing alleged discrimination on the basis of Mr. Chan Chan's "African" heritage, Def.'s Mot., Ex. L (EEOC Intake Form), at 2, and an informal email sent to Mr. Mantasas on April 24, 2017 complaining of "several years" of poor treatment from Ms. Mavis Appleby, Def.'s Stmt. of Facts, at ¶ 35; Pl.'s Mot., Ex. 11 (April 24, 2017 Email), at 1.   But in response to this claim of retaliation, CNMC has provided a non-retaliatory basis for Mr. Chan Chan's October 24, 2017 dismissal:   Mr. Chan Chan falsified his Employee Time Exception form on October 10, 2017 to hide his tardiness during his September 25, 2017 shift.   *See* Def.'s Stmt. of Facts, at ¶¶ 47–50; *Jones*, 557 F.3d at 677.

In light of this legitimate, non-retaliatory basis for Mr. Chan Chan's termination, the question left for the Court on summary judgment is whether Mr. Chan Chan has "produced

---

[2] Mr. Chan Chan's October 24, 2017 termination is the only adverse employment action presented in the record falling within the DCHRA's one-year limitations period.   *See Chan Chan*, 2019 WL 4471789, at *7, 10 (dismissing with prejudice any retaliation claim under the DCHRA "based on actions pre-dating October 18, 2017").

sufficient evidence for a reasonable jury" to find that CNMC's non-retaliatory motive was pretextual. *Allen*, 795 F.3d at 39.  Put otherwise, "when evaluating a retaliation claim at the summary judgment stage, the court must 'consider all the evidence, taken together,' and assess whether it is sufficient to support a reasonable inference of retaliation." *Williams v. Verizon Washington, D.C. Inc.*, 304 F. Supp. 3d 183, 200 (D.D.C. 2018) (quoting *Jones*, 557 F.3d at 678). Under this standard, Mr. Chan Chan's retaliation claim in Count III of the Amended Complaint cannot survive summary judgment.

As a threshold matter, Mr. Chan Chan admits that CNMC "[e]mployees are expected to be on time" for their shifts, Def.'s Stmt. of Facts, at ¶ 18, and that each employee bears responsibility for ensuring the accuracy of their own time records, *see* Pl.'s Stmt. of Facts, at ¶ 19.  It is also undisputed that on October 10, 2017, Mr. Chan Chan filled out an Employee Time Exception form to retroactively record the hours he worked during his September 25, 2017 shift.  *See* Def.'s Stmt. of Facts, at ¶ 47; Pl.'s Stmt. of Facts, at ¶ 47.  On that form, Mr. Chan Chan "represented . . . that he started work on time at 11:00 p.m. on September 25, 2017, and ended his shift at 7:30 a.m. on September 26, 2017." *Id.*  The All Access report for Mr. Chan Chan's shift on September 25, 2017, however, "showed Mr. Chan Chan entering the employee garage at 11:18 p.m., and leaving the garage at 7:21 a.m."  Def.'s Stmt. of Facts, at ¶ 48; Pl.'s Stmt. of Facts, at ¶ 48.  Accordingly, CNMC terminated Mr. Chan Chan on October 24, 2017 for "falsifying" the entry on his September 25, 2017 Employee Time Exception form, which was inconsistent with the time entries reflected on his All Access report.  *See* Def.'s Mot., Ex. H at Ex. 15 (Oct. 24, 2017 Termination Letter), at 1.  This rationale for Mr. Chan Chan's termination is grounded in the objective falsification of a company time sheet and is disconnected from any of Mr. Chan Chan's various employment complaints, as outlined above.  *See* disc. *supra* at Part I.B.

Moreover, Mr. Chan Chan's numerous attendance violations during his CNMC employment offer additional support for CNMC's non-retaliatory dismissal of Mr. Chan Chan. In the time leading up to his eventual October 24, 2017 termination, Mr. Chan Chan incurred at least fourteen "corrective actions" from four different CNMC supervisors for a variety of attendance-related violations, including missed scans, tardiness, and absenteeism. *See* Pl.'s Stmt. of Add'l Facts, at ¶ 43(a)–(n); disc. *supra* at Section I.C (describing Mr. Chan Chan's disciplinary violations). Of note, Mr. Chan Chan also encountered specific problems with CNMC's Employee Time Exception forms. For example, Ms. Pope notified Mr. Chan Chan of inaccuracies in his Employee Time Exception forms for shifts in May 2016, *see* Def.'s Mot., Ex. H (Pope Decl.), at ¶¶ 13–16, and again for multiple shifts in August 2017, *see id.*, Ex. H at Ex. 13 (Aug. 31, 2017 Email), at 1. In fact, after these repeated inaccuracies, Ms. Pope explicitly advised Mr. Chan Chan on August 31, 2017 that "falsification of information on the Employee Time Exception form *may lead to disciplinary action including termination*." Def.'s Stmt. of Facts, at ¶ 45 (emphasis added). The fact that Mr. Chan Chan incurred such an extensive disciplinary record prior to his 2017 termination—including multiple problems with his Employee Time Exception forms—supports the conclusion that CNMC dismissed Mr. Chan Chan because of his attendance record, not in retaliation for his prior discrimination complaints. *See Ball*, 798 F. App'x at 655.

Lastly, Mr. Chan Chan's arguments *in favor* of pretextual retaliation are unavailing and unsupported by record evidence. Mr. Chan Chan first laments the fact that Ms. Pope failed to review the September 25, 2017 security footage before Mr. Chan Chan's dismissal and argues that this "failure" was a deviation from Ms. Pope's standard practice, indicative of a retaliatory motive. *See* Pl.'s Opp'n at 20–21 (citing Def.'s Mot., Ex. H (Pope Decl.), at ¶¶ 14–16). But, as CNMC rightly notes, there are two principal flaws in this argument. The first is procedural. At the

summary judgment stage, Mr. Chan Chan bears the "burden of establishing that the reason asserted by [CNMC] is pretext for retaliation." *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). Mr. Chan Chan, however, proffers no evidence in support of his argument that Ms. Pope, in fact, did not review the security footage in question or that such a failure demonstrates pretext. Instead, Mr. Chan Chan's argument regarding Ms. Pope's failure to review this security footage relies entirely on his own interpretation of Ms. Pope's declaration, rather than any affirmative record evidence. *See* Pl.'s Opp'n at 20–21; *see also Grimes v. District of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015) (explaining that on summary judgment "the defendant need only identify the ways in which the plaintiff has failed to come forward with sufficient evidence to support a reasonable jury to find in her favor on one or more essential elements of her claim").

The second problem with Mr. Chan Chan's security footage argument is substantive. Ms. Pope's declaration merely states that "[w]hen verifying the information included in time exception forms," it is her practice "to cross-reference the employee's all access report and security footage for the date in question to confirm when the employee arrived to and departed from the hospital." Def.'s Mot., Ex. H (Pope Decl.), at ¶ 13. This statement does not unequivocally assert that Ms. Pope invariably reviews both the All Access reports *and* the relevant security footage on every occasion. In fact, Ms. Pope's declaration suggests that the opposite is true, as it indicates that on various occasions Ms. Pope cross-referenced Mr. Chan Chan's Employee Time Exception forms *only* against his All Access reports, and not against any security footage. *See id.* at ¶¶ 15, 19. As such, Mr. Chan Chan's attempt to demonstrate pretext on the basis of Ms. Pope's supposed "failure" to review the security footage from his September 25, 2017 shift falls short.

Next, Mr. Chan Chan asserts that CNMC did not afford him any opportunity to explain the inconsistencies in his September 25, 2017 time records before CNMC terminated him on October

24, 2017.  *See* Pl.'s Opp'n at 21–22.  In particular, Mr. Chan Chan argues that CNMC did not consider the "sign-in sheet" he allegedly signed at 10:56 p.m. at the beginning of his September 25, 2017 shift.  *See id.*; Pl.'s Stmt. of Add'l Facts, at ¶¶ 54, 57.  But this argument also falls short.  As an initial matter, the fact that Mr. Chan Chan did not challenge the basis of his dismissal *ex ante* does nothing to refute the fact that CNMC "honestly believe[d]" Mr. Chan Chan should be terminated for the falsification of his time records.  *Ball*, 798 F. App'x at 655.  This is particularly true given the objective inconsistencies between Mr. Chan Chan's Employee Time Exception form and the All Access report from September 25, 2017, described above.  Moreover, the "sign-in sheet" Mr. Chan Chan references does not commemorate the specific time at which Mr. Chan Chan arrived for his September 25, 2017 shift.  *See* Pl.'s Opp'n, Ex. 28 (Sept. 25, 2017 Attendance Sheet), at 1.  Consequently, there would have been no reason for CNMC to consider this "sign-in sheet" when verifying the accuracy of Mr. Chan Chan's September 25, 2017 time records.  For these reasons, Mr. Chan Chan's arguments regarding his ability to challenge his termination do not offer any credible basis for a reasonable jury to find that CNMC's actions were pretextual or retaliatory.

Mr. Chan Chan's remaining arguments are similarly unpersuasive.  Mr. Chan Chan complains briefly of Ms. Pope's supposed failure to sufficiently collaborate with Mr. Mantasas before deciding to terminate Mr. Chan Chan.  *See* Pl.'s Opp' at 22.  But here again, Mr. Chan Chan cites to no record evidence to support this argument and demonstrate how Ms. Pope's allegedly unilateral process evinces a retaliatory or pretextual motive.  *See Powell*, 433 F.3d at 901.  Next, Mr. Chan Chan argues (somewhat tangentially) that there are no facts in the record "to support that [he] was *aware* of any allegations made within the July 2016 termination letter" Ms. Pope had previously drafted.  Pl.'s Opp'n at 22; *see also* Def.'s Mot., Ex. H at Ex. 10 (July 1, 2016

Termination Letter), at 1.  It is unclear, however, how *Mr. Chan Chan's* awareness of an adverse employment action in 2016 bears on the dispositive issue regarding his current retaliation claim: whether *CNMC* "honestly believed" that Mr. Chan Chan should be terminated for his falsification of the September 25, 2017 time records.  *Fischbach*, 86 F.3d at 1183.  If anything, the fact that Ms. Pope had serious concerns with Mr. Chan Chan's attendance record in 2016 supports the non-retaliatory basis of Mr. Chan Chan's termination for similar attendance violations repeated in the following year.

Finally, Mr. Chan Chan contends that Ms. Denise Cooper was not a sufficiently impartial hearing officer for Mr. Chan Chan's post-termination grievance hearing.  *See* Pl.'s Opp'n at 23. In support of this position, Mr. Chan Chan merely cites to Ms. Cooper's prior knowledge of Mr. Chan Chan's past employment complaints.  *See id.*  The Court is unpersuaded, however, that such knowledge would make Ms. Cooper unfairly partial.  And more importantly, nothing in the record suggests that Ms. Cooper herself rendered CNMC's investigation of Mr. Chan Chan's termination "inexplicably unfair," as would be necessary to potentially demonstrate pretext.  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 299 (D.C. Cir. 2015).  In fact, Ms. Cooper "took a number of steps one would expect of an investigator who sincerely sought to determine what actually happened," *id.*, including a review of the security footage, the overhead announcements at the hospital, and the relevant All Access report for Mr. Chan Chan's September 25, 2017 shift, *see* disc. *supra* at Part I.D.  And after her investigation, Ms. Cooper confirmed "that the termination of Mr. Chan Chan's employment for falsification of timecard records was appropriate."  Def.'s Stmt. of Facts, at ¶ 63 (cleaned up and quotation omitted).  At bottom, Ms. Cooper's finding is yet another data point in support of the conclusion that CNMC "honestly believe[d]" that Mr. Chan Chan should be terminated for his attendance violations.  *Ball*, 798 F. App'x at 655.

****

In sum, CNMC has proffered a legitimate, non-retaliatory basis for Mr. Chan Chan's October 24, 2017 termination: Mr. Chan Chan falsified his Employee Time Exception form on October 10, 2017 to conceal his tardiness during his September 25, 2017 shift.  CNMC has also offered ample record evidence to support this non-retaliatory rationale.  *See* disc. *supra* at Part I.D; *Cauthen v. District of Columbia*, 459 F. Supp. 3d 134, 141 (D.D.C. 2020).  In response, however, Mr. Chan Chan has not "produce[d] sufficient evidence for a jury to reasonably conclude" that CNMC's proffered basis for his termination was pretextual and retaliatory.  *Brady*, 520 F.3d at 494.  This is particularly true given the record evidence of Mr. Chan Chan's extensive disciplinary record for attendance violations during his tenure at CNMC.  *See* disc. *supra* at Part I.C. Accordingly, the Court will **GRANT** summary judgment in favor of CNMC and **DISMISS** Count III of the Amended Complaint.

**B.  Count IV – Retaliatory Hostile Work Environment**

In Count IV of his Amended Complaint, Mr. Chan Chan asserts a claim under the DCHRA for a retaliatory hostile work environment.  *See* Am. Compl., at ¶¶ 40–42.  As with his standard-form retaliation claim in Count III, Mr. Chan Chan must again demonstrate "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  In Count IV, however, Mr. Chan Chan seeks to expand the scope of the allegedly "adverse action" taken against him by CNCMC, beyond his October 24, 2017 termination alone.  *See* Pl.'s Opp'n at 23–28.  Instead, Mr. Chan Chan contends in Count IV that his October 24, 2017 termination was only the latest development in a pattern of hostile treatment he received from CNMC dating back to 2014.  *See id.*

As a threshold matter, Mr. Chan Chan is correct that a hostile work environment may support a retaliation claim. "This Circuit has recognized that a hostile work environment can amount to a materially adverse action and therefore can satisfy the second element of a retaliation claim." *Doe 1 v. George Washington Univ.*, 369 F. Supp. 3d 49, 78–79 (D.D.C. 2019) (citing *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011)). But to prevail under this theory of liability, a plaintiff must still show that his employer subjected him to retaliatory "intimidation, ridicule, and insult' of such 'sever[ity] and pervasive[ness] [as] to alter the condition of [his] employment and create an abusive working environment.'" *Doe 1*, 369 F. Supp. 3d at 79 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Mr. Chan Chan's retaliatory hostile work environment claim does not meet this threshold.

First, Mr. Chan Chan attempts to improperly "bootstrap[] . . . alleged discrete acts of retaliation into a broader hostile work environment claim." *Thomas v. Securiguard Inc.*, 412 F. Supp. 3d 62, 91 (D.D.C. 2019) (quotation omitted). Specifically, Mr. Chan Chan aggregates an assortment of employment actions from 2014 through 2017 into a single grouping. *See* Pl.'s Opp'n at 23–29. First, Mr. Chan Chan cites to the series of fourteen "corrective actions" he received from multiple CNMC supervisors for various attendance issues. *See id.* Next, Mr. Chan Chan includes his undesirable work assignments within his hostile work environment claim, *see* Pl.'s Opp'n at 25–27, citing evidence that CNMC supervisors assigned him job duties without adequate training, such as collecting bodily fluids at the hospital and power washing the garage, *see* Pl.'s Stmt. of Add'l Facts, at ¶¶ 36–39. Finally, Mr. Chan Chan also complains of an occasion in August 2017 when yet another CNMC supervisor, Mr. Karenja, denied him an overtime assignment. *See id.* at ¶ 42; Pl.'s Opp'n at 27.

These disparate employment events, however, are not "adequately linked" together in a coherent hostile work environment theory. *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (quotation omitted). Indeed, "courts are often hesitant to allow plaintiffs to bring suit under a hostile work environment theory based upon nothing more than an amalgamation of loosely related discrete acts" and, instead, consider whether "certain actions are so remote in time or different in kind that a reasonable trier of fact could not find them to be part of the same work environment." *Mason v. Geithner*, 811 F. Supp. 2d 128, 178 (D.D.C. 2011), *aff'd*, 492 F. App'x 122 (D.C. Cir. 2012). Here, Mr. Chan's Chan's proffered amalgam of adverse employment actions is simply too disjointed. First, the "corrective actions" Mr. Chan Chan cites involve a variety of attendance violations issued against him by at least four different CNMC supervisors over multiple years. *See* Pl.'s Stmt. of Add'l Facts, at ¶ 43(a)–(n). For example, on May 22, 2015 Ms. Mavis Appleby issued Mr. Chan Chan a written warning for "absenteeism and tardiness" during his shifts in the Spring of 2015, *see id.* at ¶ 43(b), but then on March 11, 2016, Ms. Pope issued Mr. Chan Chan an entirely separate written notice for "missed swipes" during a shift on March 10, 2016, *id.* at ¶ 43(j). It is unclear how such individual sanctions from different supervisors regarding distinct attendance violations are interconnected. It is even less apparent how Mr. Chan Chan's personal attendance issues relate to the receipt of supposedly undesirable work assignments in the EVS Department, or his denial of an overtime shift in August 2017. *See* Pl.'s Opp'n at 26–27. To the contrary, these various corrective actions and assignment disputes Mr. Chan Chan cites in the record are "discrete employment actions" that each involved disparate issues and various CNMC supervisors. *Thomas*, 412 F. Supp. 3d at 91.

And perhaps most significantly, there is no record evidence reasonably showing a connection between these disparate acts and CNMC's October 24, 2017 decision to terminate Mr.

Chan Chan for falsifying his Employee Time Exception form.  *See* Def.'s Mot., Ex. H at Ex. 15 (Oct. 24, 2017 Termination Letter), at 1.  For example, there is nothing in the record to reasonably substantiate a link between Mr. Chan Chan's corrective actions received from Ms. Appleby in 2015, with CNMC's decision two years later in October 2017, prompted by Ms. Pope, to terminate Mr. Chan Chan for falsifying a time entry sheet.  *See Mason*, 811 F. Supp. 2d at 178.  This is problematic for Mr. Chan Chan's hostile work environment claim because he has conceded in this case that "any retaliation claim premised on actions [pre]-dating October 18, 2017" is time-barred under the DCHRA.  *Chan Chan v. Children's Nat'l Med. Ctr.*, No. CV 18-2102 (CKK), 2019 WL 4471789, at *7 (D.D.C. Sept. 18, 2019).  Therefore, without any connection to CNMC's October 24, 2017 termination decision to bring them within the limitations period, the remaining employment actions in this case (all pre-dating October 18, 2017) cannot support a timely DCHRA claim of retaliation against CNMC.

But even if all the employment actions Mr. Chan Chan raises in the record were somehow interconnected and timely, his hostile work environment claim would still come up short.  "To prevail on such a claim, a plaintiff must show that his employer subjected him to . . . intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quotation omitted).  This is an objective inquiry that turns on "the totality of the circumstances, including the frequency of the [retaliatory] conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Id.*

Here, however, Mr. Chan Chan has not presented any evidence at the summary judgment stage that could convince a reasonable jury that CNMC subjected him to severe or pervasive ridicule, intimidation, or insult.  *See id.*  Instead, as noted above, Mr. Chan Chan has proffered

evidence bearing on a litany of corrective actions he received for absenteeism and tardiness, *see* Pl.'s Stmt. of Add'l Facts, at ¶ 43(a)–(n), and various assignment disputes related to overtime and inadequate training, *see id.* at ¶¶ 36–42.  This record evidence merely demonstrates "a series of ordinary work-related actions by supervisors, which courts typically do not find to be sufficient for a hostile work environment claim."  *Jimenez v. McAleenan*, 395 F. Supp. 3d 22, 36 (D.D.C. 2019) (quotation omitted); *see also Swann v. Office of Architect of Capitol*, 73 F. Supp. 3d 20, 32 (D.D.C. 2014) (finding overtime and tardiness disputes insufficient to support a hostile work environment claim).  Such ordinary employment actions simply do not present the type of conduct that constitutes a genuinely hostile work environment.  *See Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd*, 748 F.3d 1273 (D.C. Cir. 2014) ("[N]on-selection for a desirable position, assignment to undesirable duties . . . and being criticized by supervisors do not establish a hostile work environment.").

Finally, one last shortcoming in Mr. Chan Chan's DCHRA claim in Count IV merits attention.  In the context of a *retaliatory* hostile work environment claim, the employee must show that the "materially adverse action" complained of "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Siddique v. Macy's*, 923 F. Supp. 2d 97, 107 (D.D.C. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  At the summary judgment stage, however, Mr. Chan Chan has made no argument that any of CNMC's actions would reasonably dissuade an employee from asserting a discrimination complaint against the company.  *See* Pl.'s Opp'n at 23–28.  Moreover, the Court is unconvinced that the receipt of attendance violations, as well as disputes over unfavorable work assignments and the denial of overtime, would dissuade an employee from "'making or supporting a charge of discrimination.'" *Siddique*, 923 F. Supp. 2d at 107 (quoting *Burlington N.*, 548 U.S. at 57).  And while the inquiry

here must remain objective, the fact that Mr. Chan Chan's own employment complaints against CNMC were interposed *between* the alleged adverse actions he asserts, does nothing to support his retaliatory hostile work environment claim. *See* disc. *supra* at Part I.B–C; *Baloch*, 550 F.3d at 1199 n.5.

For the reasons above, the Court concludes that "no reasonable jury could find that [Mr. Chan Chan] has been subjected to a hostile work environment." *Grundmann*, 851 F. Supp. 2d at 7. "Rather it is plain that [he] has been subjected to no more than the 'ordinary tribulations of the workplace.'" *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The Court must, therefore, **GRANT** CNMC's Motion for Summary Judgment and **DISMISS** Count IV of the Amended Complaint.

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court **GRANTS** CNMC's Motion for Summary Judgment. Accordingly, the Court **DISMISSES** Mr. Chan Chan's claim in Count III of the Amended Complaint for retaliation under the DCHRA, as well as Mr. Chan Chan's claim in Count IV of the Amended Complaint for a retaliatory hostile work environment under the DCHRA. The Court has now **DISMISSED** each of Mr. Chan Chan's claims in the Amended Complaint.

An appropriate Order accompanies this Memorandum Opinion.

**Dated**: January 8, 2021

                                        /s/
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge